UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MELALEUCA, INC., an Idaho corporation,<br><br>                  Plaintiff,<br>     v.<br><br>BRIAN BARTHOLOMEW and ANGELIQUE BARTHOLOMEW, husband and wife,<br><br>               Defendants. | Case No. 4:12-cv-00216-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 8). The Court heard oral argument on the motion on May 10, 2012. The Court will grant the motion in part for the reasons explained below.

## BACKGROUND

Melaleuca is a consumer goods company that sells primarily nutritional, personal care, and household products. Melaleuca sells products directly to its customers by using independent contractors called Marketing Executives. Melaleuca's Marketing Executives refer customers to Melaleuca and earn commissions on purchases made by those customers. Additionally, Marketing Executives earn commissions through a somewhat complicated structure, which generally rewards them for training, motivating, and otherwise supporting other Marketing Executives in their efforts to refer customers. Each Melaleuca Marketing Executive has a Marketing Organization which consists of the

customers referred by that Marketing Executive and the other Marketing Executives he or she supports, plus the customers and Marketing Executives referred or supported by those Marketing Executives, and so on.

When Marketing Executives join Melaleuca, they sign what is called an Independent Marketing Executive Agreement with Melaleuca. In this case, Defendants Angelique Bartholomew and Brian Bartholomew each signed an agreement on November 10, 2005 when they first joined Melaleuca as Marketing Executives. *LaClare Decl.*, Ex. A (Dkt. 8-4). The signature line of that agreement indicates that the Marketing Executive agrees to the terms on the front and back of the agreement. The back side of the agreement is titled Terms and Conditions. Section 9 of the Terms and Conditions reads: "I have carefully reviewed the Melaleuca Compensation Plan and Statement of Policies and acknowledge that they are incorporated as part of this Agreement in their present form and as modified from time to time by Melaleuca at its sole discretion." *Id*. A copy of the Melaleuca Compensation Plan and Statement of Policies in effect at the time the Bartholomews signed their agreement in 2005 is not attached to the agreement, nor was it provided to the Court.

On November 30, 2007, Angelique Bartholomew signed a second agreement, which incorporated an amended version of the Statement of Policies. *Second LaClare Decl.*, Exs. D & E (Dkt. 11-2). On December 11, 2011, Angelique Bartholomew signed a third agreement, which incorporated the current version of Melaleuca's Statement of Policies. *Second LaClare Decl.*, Ex. F (Dkt. 11-2). Policy 20 of the current Statement of Policies, which is set forth in its entirety here, states,

**20 Non-Solicitation and Conflicts of Interest**

Marketing Executives are independent contractors and may be active in other business ventures while they are Marketing Executives for Melaleuca. However, to qualify for compensation under Melaleuca's Compensation Plan, Marketing Executives have the ongoing responsibility to service, supervise, motivate, train and assist the Marketing Executives in their Marketing Organization. They also have the responsibility to promote Melaleuca products and the Melaleuca income opportunity. Melaleuca and its Marketing Executives have made a great investment in the establishment of organizations consisting of Customers and Marketing Executives. This constitutes one of Melaleuca's most valuable assets. Melaleuca reserves the right to cease paying compensation to any Marketing Executive who recruits any Melaleuca Customer or Marketing Executive to participate in another business venture. In order to protect the efforts of all Marketing Executives in building and maintaining their individual Marketing Organizations and Customer bases, and in order to protect Melaleuca's interest in the overall Customer base, Marketing Executives and all members of their Immediate Household are required to abide by the following policies:

    (a)    Non-Solicitation of Melaleuca Customers and Marketing Executives:

        (i)    During the period that their Independent Marketing Executive Agreements are in force Marketing Executives and all members of their Immediate Household are prohibited from directly, indirectly or through a third party recruiting any Melaleuca Customers or Marketing Executives to participate in any other business venture

        (ii)    For a period of twelve months after cancellation or termination for any reason of a Marketing Executive's Independent Marketing Executive Agreement, the Marketing Executive and all members of his or her Immediate Household are prohibited from directly, indirectly or through a third party recruiting to participate in any other business venture any Melaleuca Customers or Marketing Executives:

            (1) who were in the Marketing Executive's Marketing Organization or Support Team at any time during the term of his or her association with Melaleuca;

            (2) with whom the Marketing Executive had contact during the term of his or her association with Melaleuca;

            (3) whose contact information (name, address, phone number or email address, etc.) the Marketing Executive or members of his or her Immediate Household has obtained at any time during the term of his or her association with Melaleuca; or

(4) whose contact information (name, address, phone number or email address, etc.) the Marketing Executive or members of his or her Immediate Household obtained at any time from another person who obtained the information because of any other person's association with Melaleuca.

The prohibitions under clauses (a)(i) and (ii) above include but are not limited to, presenting or assisting in the presentation of other business ventures to any Melaleuca Customer or Marketing Executive or implicitly or explicitly encouraging any Melaleuca Customer or Marketing Executive to join any other business ventures. It is a violation of this policy to recruit a Melaleuca Customer or Marketing Executive to participate in another business venture even if the Marketing Executive does not know that the prospect is also a Melaleuca Customer or Marketing Executive. It is the Marketing Executive's responsibility to first determine whether the prospect is a Melaleuca Customer or Marketing Executive before recruiting the prospect to participate in another business venture. (Please refer specifically co the definition of "recruit" in the Definitions of Terms at the end of these Policies.)

(b) During the period that their Independent Marketing Executive Agreements are in force, and for a period of twelve months after the cancellation or termination thereof for any reason, Marketing Executives and all members of their Immediate Household are further prohibited from the following:

(i) Producing any literature, tapes or promotional material of any nature (including but not limited to websites and emails) which is used by the Marketing Executive or any third person to recruit Melaleuca Customers or Marketing Executives to participate in another business venture;

(ii) Selling. offering to sell or promoting any competing products or services to Melaleuca Customers;

(iii) Offering any non-Melaleuca products, services or business ventures in conjunction with the offering of Melaleuca products, services or income opportunity or at any Melaleuca meeting. seminar, launch, convention, or other Melaleuca function.

(c)(i)Violation of any provision of this Policy 20 constitutes a Marketing Executive's voluntary resignation and cancellation of his/her Independent Marketing Executive Agreement, effective as of the date of the violation, and the forfeiture by the Marketing Executive of all commissions or bonuses payable for and after the calendar month in which the violation occurred.

(ii)If Melaleuca pays any bonuses or commissions to the Marketing Executive after the date of the violation, all bonuses and commissions for

and after the calendar month in which the violation occurred shall be refunded to Melaleuca.

(iii)Melaleuca may seek and obtain from the violating Marketing Executive both injunctive relief and damages for violations of this Policy 20. Melaleuca, may, at its option, elect to enforce this Policy by lawsuit in a court of competent jurisdiction in Idaho rather than by arbitration.

(iv)In addition to being entitled to a refund of bonuses and commissions and to damages as described above, in the event a person or entity violates this Policy 20, Melaleuca and any Marketing Executive that experiences an adverse financial impact as a result of such person or entity's violation of this Policy 20 shall be entitled to an accounting and repayment of all profits, compensation, commissions, remunerations or other benefits which the person or entity directly or indirectly receives and/or may receive as a result of, growing out of, or in connection with any violation of this Policy. Such remedy shall be in addition to and not in limitation of any damages, or injunctive relief or other rights or remedies to which Melaleuca is or may be entitled at law or in equity.

(d) Violations of this Policy 20 are especially detrimental to the growth and sales of other Marketing Executives' Independent Melaleuca Businesses and to Melaleuca's business. Consequently, Marketing Executives who have knowledge that any Marketing Executive has violated this Policy must immediately report that information to Melaleuca's Policy Administration Department. The failure of a Marketing Executive to report such information to Melaleuca will also constitute a violation of this Policy. The names of those reporting violations of this Policy 20 will be held in confidence.

*LaClare Decl.*, Ex. B (Dkt. 8-4).

The endorsement line on the back of checks Melaleuca used to pay Ms. Bartholomew, including one as recent as March 2012, states that "[b]y endorsing, depositing or cashing this check I affirm that I am currently in compliance with, and reaffirm and agree to be bound by and to comply with, all terms and conditions of my Independent Marketing Executive Agreement and Melaleuca's Policies, as amended from time to time." *Second LaClare Decl.*, Ex. G (Dkt. 11-3).

The Bartholomews recently (less than 12 months ago) left Melaleuca and apparently joined another multi-level marketing company called Independent Energy

Alliance ("IEA"). Melaleuca claims that the Bartholomews have breached Policy 20 by soliciting other Melaleuca Marketing Executives to join IEA. There is evidence that Ms. Bartholomew has attempted to recruit at least one Melaleuca Marketing Executive whom she met while she was a Marketing Executive. *LaClare Decl.*, Ex. C, *Latwanas Affidavit* (Dkt. 8-4).

Melaleuca asks the Court to enjoin the Bartholomews from "recruiting Melaleuca Marketing Executives and/or Customers in violation of Policy 20 of Melaleuca's Statement of Policies or assisting or aiding other current and former Melaleuca Marketing Executives or any corporation or other entity with which they are associated, or their officers, agents, employees, servants, and/or anyone acting in concert or participating with them, in encouraging or inducing other Melaleuca Marketing Executives in violating their IMEAs." *Pf's Opening Brief*, p. 17 (Dkt. 8-1).

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that: 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in its favor; and 4) an injunction is in the public interest. *Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966, 973-74 (9th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). A preliminary injunction is "an extraordinary remedy never awarded as of right." Id. at 376. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*

## ANALYSIS

**A.      Likelihood of Success on the Merits**

 Melaleuca asserts a claim for breach of contract against the Bartholomews. Specifically, Melaleuca asserts that the Bartholomews violated the non-solicitation agreement outlined in Policy 20 of the Statement of Policies, which is generally incorporated by reference into Independent Marketing Executive Agreements signed by Melaleuca Marketing Executives.

In Idaho, like many other states, "[r]estrictive covenants not to compete in an employment contract, though enforceable, are disfavored and will be strictly construed against the employer." *Freiburger v. J-U-B Engineers, Inc.*, 111 P.3d 100, 104 (Idaho 2005). In order to be enforceable, the covenant "must be ancillary to a lawful contract supported by adequate consideration, and consistent with public policy." *Id.* In addition, it "must be reasonable as applied to the employer, the employee, and the public." *Id.*

Idaho also has a statute regarding restricting covenants and other similar agreements. It states that an independent contractor may enter into a written agreement or covenant that protects the employer's legitimate business interests and prohibits a key independent contractor from engaging in employment or a line of business that is in direct competition with the employer's business after termination of employment. I.C. § 44-2701. The agreement or covenant is enforceable if it "is reasonable as to its duration, geographical area, type of employment or line of business, and does not impose a greater restraint than is reasonably necessary to protect the employer's legitimate business interests."

Policy 20, which is entitled Non-Solicitation and Conflicts of Interest, may not fall within the technical definition of a non-compete agreement. However, it is similar enough to a non-compete agreement that it is appropriate to apply the same legal standard for determining its enforceability. At the very least, the non-solicitation policy needs to meet a reasonableness standard like the one applied to non-compete agreements or the one found in the Idaho statute governing restrictive covenants. Thus, the non-solicitation agreement is only enforceable to the extent it is reasonable in duration, geographical area, type of employment or line of business, and does not impose a greater restraint than is reasonably necessary to protect the employer's legitimate business interests.

Policy 20 does not appear to meet this standard. As outlined above in its entirety, Policy 20 is a very expansive provision. During the period their agreements are in force, it prohibits the Marketing Executives and all members of their Immediate Household[1] from directly, indirectly or through a third party recruiting any Melaleuca Customers[2] or Marketing Executives to participate in any other business venture. Moreover, this prohibition continues for 12 months after cancellation or termination of a Marketing Executive's agreement. During that period, the Marketing Executive and all members of his or her Immediate Household are prohibited from directly, indirectly or through a third party recruiting to participate in any other business venture any Melaleuca Customers or

---

[1] "Immediate Household" is defined as married couples and persons residing in the same home, and with respect to Marketing Executives and Customers which are entities (e.g., corporations, tax exempt entities, trusts, etc.) rather than individuals, Immediate Household means the shareholders, owners, directors, officers, trustees, responsible parties, etc., of such entities and persons married to or residing in the same home with the persons who are the shareholders, owners, directors, officers, trustees, responsible parties, etc. of such entities.

[2] "Customer" is defined as a person who has an Enrollee, has completed, executed and delivered to Melaleuca's Customer Membership Agreement and has paid to Melaleuca the appropriate membership fee. Customers are either Direct Customers or Preferred Customers.

Marketing Executives: (1) who were in the Marketing Executive's Marketing Organization or Support Team at any time during the term of his or her association with Melaleuca; (2) with whom the Marketing Executive had contact during the term of his or her association with Melaleuca; (3) whose contact information (name, address, phone number or email address, etc.) the Marketing Executive or members of his or her immediate Household has obtained at any time during the term of his or her association with Melaleuca; or (4) whose contact information (name, address, phone number or email address, etc.) the Marketing Executive or members of his or her immediate Household obtained at any time from another person who obtained the information because of any other person's association with Melaleuca.

These prohibitions are far too expansive to be reasonably necessary to protect Melaleuca's legitimate business interests. By way of example, the Bartholomews would be in violation of Policy 20 if, during the 12 months after they left Melaleuca, *anyone* residing in their home started *any* business and recruited someone to work for him/her who happened to be a Customer or Marketing Executive at Melaleuca and whose email address was obtained because of some association with Melaleuca. Similarly, they would be in violation of Policy 20 if they recruited any Melaleuca Customer or Marketing Executive to participate in any business if they simply had had contact with that person during the term of their association with Melaleuca.

Lesser restrictions in non-solicitation agreements between a distributor and the multi-level marketing company for whom she contracted have been found reasonable. For example, in *YTB Travel Network of Illinois, Inc. v. McLaughlin*, 2009 WL 1609020

(S.D.Ill 2009), the plaintiff was a multi-level marketing company. It requested preliminary relief based on a non-solicitation agreement. The plaintiff asked the court for an order restraining the defendants from recruiting, soliciting or enrolling plaintiffs' distributors or customers for other network marketing companies. Plaintiff's distributors whom defendants personally sponsored at plaintiff's company were excepted from the non-solicitation agreement. In evaluating the reasonable success on the merits, the court found that preliminary relief was appropriate in part because the defendants were not prevented from taking their "downline" of those individuals they personally recruited or members of the defendants' sales team whom they personally sponsored. *YTB Travel Network of Illinois, Inc. v. McLaughlin*, 2009 WL 1609020, *4 (S.D.Ill 2009).[3]

Here, Melaleuca asks the Court to prevent the Bartholomews from recruiting almost anyone at Melaleuca remotely associated with them. More troubling, Melaleuca asks the Court to prevent the Bartholomews from recruiting those individuals to *any* business, not just to another multi-level marketing operation. Melaleuca has simply pushed the envelope too far, and its non-solicitation agreement imposes a greater restraint than is reasonably necessary to protect Melaleuca's legitimate business interests.

However, the Idaho Supreme Court, in addressing restrictive covenants in employment contracts, has concluded that a court can modify restrictive covenants ancillary to employment agreements. *Insurance Center, Inc. v. Taylor*, 499 P.2d 1252, 1255-56 (Idaho 1972). In *Taylor*, the Idaho Supreme Court stated that the modification

---

[3] Other Courts have similarly recommended preliminary relief where the non-solicitation agreement was much more narrowly tailored. *See e.g.*, *Talk Fusion, Inc. v. Ulrich*, 2011 WL 2681677 (M.D.Fla 2011) (Based on a Florida statute requiring non-solicitation covenants be reasonable in time, area and line of business, the court recommended preliminary relief of a more restrictive nature and limited it to 6 months).

principle "allows a court to escape the rule of arbitrary refusal to enforce a covenant which, while unreasonable or indefinite in some of its terms, nevertheless serves to protect a legitimate interest of the parties or the public as the case may be." *Id*. at 1255. The court noted that "[r]ather than choosing between absolute enforcement or unenforcement, there will be a wide range of alternatives available to meet the particular facts of the case being tried." *Id*. at 1256. It seems the same policy should apply to non-solicitation agreements like the one at issue here.

Under the circumstances of this case, although the Court finds that Melaleuca is unlikely to succeed on the merits of its claim asking the Court to enforce Policy 20 as written, the Court finds that Melaleuca is likely to succeed in enforcing a more reasonable modification of the policy. Moreover, although the Court also has some minor concerns with other elements of the breach of contract claim, such as whether the current Statement of Policies applies to the Bartholomews (particularly Brian Bartholomew), the Court is not overly concerned with those issues. Accordingly, the Court finds that Melaleuca is likely to succeed on the merits – in at least some measure.

## B.     Irreparable Injury

The Court also finds that Melaleuca will suffer irreparable harm if preliminary relief is not ordered. Multi-level marketing companies such as Melaleuca conduct the lion's share of their business through their marketing executives or other distributor type networks. A multi-level marketing company's relationship with its distributors is crucial to the success of the company's marketing program. In fact, they are probably the most important asset to the company – even more important than the product. If they are

recruited away from the company in violation of contractual obligations, the network will

suffer. While it is difficult to calculate damages for these losses, there is no doubt it could

be significant. The Court is satisfied that without preliminary relief, Melaleuca may lose

marketing executives in breach of contract. Thus, Melaleuca will suffer irreparable harm

if at least some form of limited preliminary relief is not issued as discussed below.

## C.      Balance of Equities

The Court also concludes that the harm Melaleuca will suffer outweighs the harm

the Bartholomews will suffer, but only if the relief granted is limited in the manner

discussed below. Without the issuance of some injunctive relief, Melaleuca will suffer the

loss of Marketing Executives, which will undoubtedly hurt its bottom line. Melaleuca

may not be able to recover these Marketing Executives or the losses associated with

them.

On the other hand, the Bartholomews will suffer little harm based on the limited

relief the Court intends to issue. The Court notes that granting the specific relief

requested by Melaleuca – complete compliance with Policy 20 – would potentially cause

the Bartholomews much more harm because it could virtually prevent them from entering

into any business venture. However, as explained below, the relief granted here is limited

in both time and scope.

## D.      Public Interest

The Court recognizes that the public has an interest in a competitive marketplace.

It is in the public's interest for the Bartholomews to be productive for themselves, and to

create jobs for others they know. However, the relief granted in this case will not

unreasonably prevent the Bartholomews from competing in the marketplace. Moreover, it will uphold the law requiring parties to comply with contractual obligations. Accordingly, the Court finds that preliminary relief is in the public's interest.

## CONCLUSION

Under these circumstances, the Court will grant Plaintiff's motion, but will not grant the specific relief requested. The Court will limit the relief to what it feels is reasonable based on the limited record before it, and the cursory review of case law the Court has been able to do in the short time the Court has had the pending motion before it.

However, because this case is before the Court on a motion for preliminary injunctive relief, plaintiff's motion was made on a rushed schedule with expedited briefing. The Court is also issuing its decision posthaste. "Hasty decisions are rarely wise decisions, and the law recognizes that fact: Preliminary injunctions are issued on a showing of a 'likelihood' of success; there is no final resolution of any issue." *Watters v. Otter*, 2012 WL 640941, at *1 (D. Idaho Feb. 26, 2012). Accordingly, as with any ruling on a motion for preliminary relief, the Court's findings are not final. The Court fully expects to be further enlightened by the parties about some of the unique aspects of multi-level marketing companies in general, and Melaleuca specifically. This may affect the decision made here dramatically. For these reasons, the Court will be receptive to a proposal to expedite this case if either party wishes to do so. The Court will also be receptive to a motion to reconsider by either party, with the understanding that the Court will expect more thorough briefs and more time to address the motion. Alternatively, the

parties may wish to meet and confer in an attempt to reach a stipulated injunction that better reflects the facts of this case.

To move this case forward expeditiously, the Court will schedule a telephonic scheduling conference within a matter of days, and the parties should be prepared to discuss these matters and potential short deadlines if requested by either party.

## ORDER

**IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 8) is **GRANTED** as follows – The Bartholomews are enjoined from recruiting Customers and Marketing Executives, as defined in Melaleuca's current definitions, for any other multi-level marketing business, with the exception of any Customer or Marketing Executive personally enrolled downline by the Bartholomews, any person in the Bartholomews Immediate Household as that term is defined in Melaleuca's current definitions, any member of the Bartholomews immediate family (parents, siblings or children), and any Customer or Marketing Executive who has joined Melaleuca since the Bartholomews left Melaleuca. The Court is not altogether familiar with terms associated with multi-level marketing organizations, so to clarify, the Court notes that by "personally enrolled downline" the Court means Customers and Marketing Executives recruited to Melaleuca personally by the Bartholomews. The injunction shall be in place until it is further reviewed by the Court pursuant to motion or until a final

decision is entered following a trial, but not more than one year from the date the Bartholomews left Melaleuca.

DATED: May 14, 2012

B. Lynn Winmill
Chief Judge
United States District Court